**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CYBER LITIGATION INC.,[1] | Bankr. No. 20-12702 (CTG) |
| Debtor. | |
| DRIVETRAIN, LLC, in its capacity as Trustee of the Cyber Litigation Trust, | |
| Plaintiff, | |
| vs. | Adv. No. **Refer to Summons** |
| ANTHONY DAWSON, | |
| Defendant. | |

## COMPLAINT

Plaintiff Drivetrain, LLC ("Plaintiff"), in its capacity as Trustee of the Cyber Litigation Trust (the "Plan Trust") of the estate of NS8 Inc. n/k/a Cyber Litigation Inc. ("NS8" or "Debtor"), sues Defendant Anthony Dawson ("Dawson") for damages and other relief as follows:

### I.    NATURE OF THE ACTION

1.    NS8 was a cybersecurity startup founded in 2016 that reported enormous financial success with tens of millions of dollars in annual revenue. However, nearly all of NS8's customers were fake. They were concocted by Adam Rogas, who served as both Chief Executive Officer and Chief Financial Officer for virtually the entirety of NS8's pre-bankruptcy existence. With the assistance of Dawson, who was NS8's Chief Revenue Officer ("CRO"), Rogas, using fake financial statements and customer counts, was able to convince outside investors to invest more

---

[1]    Debtor and the last four digits of its federal taxpayer identification number is as follows: Cyber Litigation Inc. (6056). The notice address for Debtor is Cyber Litigation Inc., PO Box 34120, Las Vegas, NV 89133.

than $150,000,000 in NS8.  Rogas then caused approximately $72,000,000 of these funds to be transferred directly to NS8's early investors and employees, including Dawson, through a fraudulent tender offer in June 2020.

2.      The investors were left with nothing, while Dawson, and other senior executives and employees who indirectly participated in, or turned a blind eye to Rogas's fraud, received millions of dollars through the tender offer, in addition to significant compensation in the form of wages, salary, bonuses, and employee benefits for services that provided little to no value but rather perpetuated a fraudulent enterprise. For his part, Dawson received $1,464,647 in tender offer proceeds, in addition to hundreds of thousands of dollars in salary, bonuses, and benefits.

3.      Simply, this is a classic fraudulent transfer that Plaintiff is entitled to avoid and recover from Dawson.

4.      But, that is not the end of the story.  Through numerous and varied sources, over his more than two-year tenure at NS8 as its CRO, Dawson gained intimate knowledge of material irregularities and alarming discrepancies regarding NS8's reported revenue, customer counts, and financial controls.  In that position, Dawson not only was NS8's head of sales, a team that was essential to Rogas's ability to perpetuate the façade that NS8 was a legitimate business, but used Rogas's fraudulent revenue and customer data to prepare false monthly and annual projections for the company and to help secure baseless commissions and bonuses for members of his team.  As a fiduciary to NS8 and its investors, Dawson should be held accountable for every dollar that investors lost as a result of Rogas's fraud.

5.      Accordingly, Plaintiff not only seeks to avoid and recover the fraudulent transfers made to Dawson, but also seeks full compensation for his breach of fiduciary duty as an officer of NS8.

## II.    <u>JURISDICTION AND VENUE</u>

6.      This Court has subject matter jurisdiction over this adversary proceeding, which arises under title 11 in this chapter 11 case pursuant to 28 U.S.C. §§ 157 and 1334(b).

7.      This adversary proceeding is a "core" proceeding to be heard and determined by this Court pursuant to 28 U.S.C. § 157(b)(2) and this Court may enter final orders for matters contained herein.

8.      Venue is proper in the District of Delaware pursuant to 28 U.S.C. § 1409.

9.      Pursuant to Local Bankruptcy Rule 7008-1, Plaintiff consents to entry of final orders or judgments by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## III.    <u>THE PARTIES</u>

10.      On October 27, 2020 (the "<u>Petition Date</u>"), Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

11.      On April 13, 2022, the Plan Trust was established pursuant to Debtor's *Modified Second Amended Chapter 11 Plan of Liquidation* (the "<u>Plan</u>"), and Plaintiff became trustee of the Plan Trust.

12.      Dawson was hired as CRO of NS8 in February 2018 and remained in that position until his departure in September 2020.

13.      Dawson was a veteran software industry executive who had founded and led both direct and channel sales for multiple organizations. As CRO, Dawson reported only to Rogas.  As CRO, he was the head of the sales division and was responsible for building and leading global teams for NS8 in sales, client success, business development, and alliances.

14.      Dawson is a citizen of the United States of America.

15.     Dawson has been represented throughout the NS8 bankruptcy by William Coggshall, Esquire of the Gordon Rees law firm.

## IV.     FACTUAL BACKGROUND

### A.     The Founding of NS8 and Dawson's Role.

16.     In August 2016, Rogas and five other individuals co-founded NS8 and received founder's shares.

17.     In February 2018, Dawson began working at NS8 full time. He was compensated with a cash salary, cash and equity bonuses, and benefits during his employment. Dawson's cash bonuses were based on NS8's performance during each calendar quarter, while his equity bonuses were based on NS8's performance during each calendar year.

### B.     NS8 Was a Fraud.

18.     NS8's purported business was to develop and sell electronic tools to help online vendors combat advertising fraud and assess the risk of fraud associated with customer transactions. Specifically, NS8's founders claimed to have developed a cybersecurity fraud prevention services company, in part to serve a growing need to manage and mitigate cybersecurity theft.[2]

19.     For virtually the entirety of NS8's existence, prior to its bankruptcy, Rogas served as Chief Executive Officer, Chief Financial Officer, and a member of NS8's board of directors. Rogas exerted significant control over NS8's business and was highly compensated.

---

[2]     *See, e.g.*, Farnaz M. Alemi, Bloomberg Law (May 27, 2021, 4:01 AM), How Cybercriminals Are Stealing Your Ad Dollars, available at https://news.bloomberglaw.com/securities-law/how-cybercriminals-are-stealing-your-ad-dollars (reporting that experts estimate that the global digital advertising space loses $51 million per day to advertising fraud).

20.     On Rogas's watch, NS8's business was also failing dramatically. Its expenses between 2016 and 2020 exceeded $13 million while it generated less than $500,000 in gross revenue.

21.     Despite these awful results, NS8, in order to attract outside investment, falsely reported, through doctored bank statements, financial statements, and other corporate documents, a picture of financial success.

22.     For example, in 2017, NS8 generated less than $25,000 in total revenues. Yet, NS8's financial statements, altered by Rogas, reported that the company's revenues were $275,000.

23.     Likewise, while NS8 reported to investors that it had over 180 paying customers in 2017, the actual number was fewer than 30.

24.     NS8, through Rogas, falsely reported that it had earned over $8.5 million in gross revenue in 2018, and over $39.6 million in gross revenue in 2019, even though its annual revenue in any year never exceeded $170,000.

25.     Throughout 2016 to 2020, NS8's expenses and liabilities were significantly higher than its assets and NS8 was never profitable.

26.     Based on the false information generated by Rogas and his aides, outside investors began to view NS8 as a potential unicorn.[3]  By the fall of 2019, NS8 had raised nearly $79 million in equity investments from outside investors (including approximately $50 million through a Series A Preferred Stock fundraising in September and November 2019) who invested based upon fictitious revenues and false customer numbers submitted to them by Rogas and his aides.

---

[3]    A "unicorn" in venture capital parlance is a privately-held startup with an enterprise valuation in excess of $1 billion. Rodriguez, Salvador (September 3, 2015). "The Real Reason Everyone Calls Billion-Dollar Startups 'Unicorns'". International Business Times. IBT Media Inc.

**C.    NS8's Fraud Was Well Known to Its Officers, Directors and Employees.**

27.    Unbeknownst to NS8's investors, many NS8 officers, managers, and employees *knew* of alarming irregularities reported in NS8's financials. These irregularities included irreconcilable discrepancies regarding NS8's customer counts—between Rogas's representations on the one hand and every other source of information that NS8 officers, managers, and employees had access to on the other—including information from platform partners and third parties—Dawson himself received information about NS8's customers from its platform partners that did not confirm the number of customers NS8 purportedly had—as well as internal data sources.

28.    For example, NS8's internal customer database, called the "admin portal" contradicted Rogas's representations regarding customer numbers. NS8's officers knew that the admin portal did not identify all of NS8's paying customers and, indeed, identified only a purported small subset.

29.    Likewise, nearly all of NS8's customers employed Version 1 ("V1") of NS8's platform, which maintained customer names as anonymous. NS8 officers were told that the customers were anonymous because Rogas and others constructed the software without ensuring that it would capture customer-related data. Still, many NS8 officers, managers, and others questioned how this could be the case: why would NS8 build a product that could not identify any customer information?

30.    NS8 developed a second version of its software platform ("V2") in or around the first half of 2019. Unlike V1, V2 had the capability to track customer names. As a technology company, it would have been normal course for NS8's customers to immediately migrate to V2. But very few customers in fact migrated to V2, which indicated that something was wrong (e.g., that the customers were not being transferred because there were no customers).

31.     As the years passed and NS8 remained unable to identify its individual paying customers, NS8's customer data issue served as a running joke—an invention that Dawson and other sales managers and employees questioned internally. In August 2019, for example, an NS8 manager was taken aback by NS8's reported customer counts, saying to Dawson, "70 Accounts paying over 3k?!" The manager continued, saying "Screw knowing about all our customers... just give us that list lol."

32.     Other indicia of fraud included that NS8 received few customer support inquiries. NS8 employees, again turned a blind eye, and unreasonably assumed that NS8's product worked so perfectly that customers never needed to contact NS8 with any support issues. This contradicted their own issues with NS8's products, including how they were unable to adopt a technical solution for NS8's inability to identify all of its paying customers.

33.     NS8 officers and employees also openly acknowledged that Rogas was the single individual, out of NS8's over 200 employees, who could identify its thousands of customers. In June 2018, Dawson contacted Rogas for information regarding NS8's monthly recurring revenue ("MRR"), acknowledging that it makes no sense that Rogas had this information while, as head of sales, Dawson did not. Dawson wrote, "bookings wise...but I have limited access and can't know that information. As odd as this sounds to me, can YOU let ME know how we are ending up MRR wise? ☺ ☺."

34.     Dawson was also aware as of June 2019 that there were repeated issues with the accuracy of financial data and discrepancies in spreadsheets provided by Rogas, including not just missing customer data, but inability to link partner payments, repeated unsolved data integrity issues, and suspicions among the sales team members about potential hidden problems in addition to the frustration about the absence of crucial customer data.

35.    Although Dawson was aware that Rogas could not identify a single customer purportedly captured in Mr. Rogas' spreadsheet, he relied on such information to prepare revenue projections for NS8 (including monthly and annual projections). Despite his concerns, Dawson also communicated the officially reported customer numbers to other employees and external parties, including investors, and used that fictitious data to advocate for and award commissions and/or bonuses to members of his sales team. Dawson testified at his Rule 2004 examination that although NS8 never had a product capable of meeting enterprise requirements, he continued to hire a sales team for enterprise clients, while conceding he "knew it was a waste."

36.    Additionally, numerous NS8 officers and managers, including Dawson, knew that certain third parties had declined to invest in NS8 and expressed obvious skepticism and concerns around NS8's reported sales revenue and customer counts. For example, in 2018 a venture capital firm declined to invest in NS8 and cited NS8's failure to provide sufficient validation of its reported revenue and customer counts. Despite this knowledge, NS8's officers, including Dawson, took no specific action in response.

37.    Throughout NS8's existence, Rogas controlled NS8's financial and sales information despite having other executive finance and sales officers in place. Rogas also maintained exclusive control over both NS8's revenue bank account and the data and metrics underlying NS8's purported sales revenue and customer counts. This was exceedingly unusual and should have alerted all officers of the company, including Dawson, who was aware of Rogas's exclusive control, that there was potential fraud.

38.    Rogas caused NS8 to pay millions of dollars in excessive compensation and stock buybacks to Dawson and the other NS8 employees and officers who turned a blind eye to his scheme and supported him in convincing outside investors to invest in NS8.

### D.     NS8's Tender Offer.

39.     Rogas was determined to ensure that he and his key executives like Dawson be paid millions of dollars at the expense of NS8's investors.

40.     In spring 2020, Rogas, once again using fake financials, convinced outside investors to invest nearly $73 million in NS8 through another Series A Preferred Stock fundraising.

41.     On May 11, 2020, NS8 notified its shareholders—including former directors, officers, founders and employees of NS8—that it was commencing a tender offer (the "Tender Offer"), in which NS8 would repurchase tendered shares for $18.50 per share. NS8 set June 8, 2020 as the deadline to tender shares. Shareholders elected to tender so many of their shares that the Tender Offer was oversubscribed. The oversubscription caused NS8 to make a pro rata deduction for any seller who elected to tender more than approximately 30% of their eligible shares.

42.     Rogas planned to use the proceeds of the latest Series A Preferred Stock fundraising to finance the Tender Offer. He knew that the investors' money would be paid to NS8's earlier investors and employees, and that because NS8's revenues and customers were fake, its remaining investors would almost certainly lose all of their investments.

43.     On or around June 23, 2020, NS8 distributed, from its bank accounts, over $72 million in exchange for the shares that it repurchased in the Tender Offer. The $18.50 per share price that NS8 paid these transferees was exponentially higher than the actual value (if any) of the shares, as the value of the shares NS8 purchased in the Tender Offer was based exclusively on Rogas's fraudulent financial statements that cleverly hid the fact that NS8 was insolvent.

44.     For his part, Rogas received $17,500,000 in tender offer proceeds.

45.     Other former employees, officers, directors and early investors of NS8, received over $50 million as a result of the Tender Offer.

46.     Dawson participated in the Tender Offer and personally received $1,464,647 (the "Tender Offer Proceeds").

47.     The Tender Offer Proceeds were in addition to the salary and bonuses that NS8 paid to Dawson in the two years prior to the Petition Date (the "Employment Proceeds"). The Employment Proceeds included $442,224.67 of salary and $131,250.00 of bonuses.

**E.      NS8's Fraud Begins to Unravel.**

48.     In June 2020, following the Tender Offer, Rogas's fraudulent scheme began to unravel. Given NS8's seemingly rapid growth, certain board members impressed upon Rogas that it was imperative that NS8 supplement and expand its executive leadership team. These officers, once hired, had a significant impact on how the company was run. Almost immediately, the new officers began to question and determinedly investigate discrepancies and irregularities that incumbent NS8 officers previously had identified, yet ignored.

49.     On September 1, 2020, Rogas abruptly resigned from NS8.

50.     On September 17, 2020, Rogas was arrested by the Federal Bureau of Investigations and charged with one count of securities fraud, one count of fraud in the offer or sale of securities, and one count of wire fraud. *United States v. Rogas*, 20-cr-00539 (S.D.N.Y. Oct. 13, 2020), ECF No. 7. Also on September 17, 2020, the United States Securities and Exchange Commission (the "SEC") filed a civil complaint against Rogas and several entities that he controls, based on this exact same underlying conduct. *U.S. Sec. & Exch. Comm'n v. Rogas*, 20-cv-07628 (S.D.N.Y. Sept. 17, 2020), ECF No. 1.

51.     On March 16, 2022, Rogas pled guilty to securities fraud. *See United States v. Rogas*, 20-cr-00539 (S.D.N.Y. March 28, 2022), ECF No. 59.

52.     On November 3, 2022, Rogas was sentenced to sixty months in prison. *See United States v. Rogas*, 20-cr-00539 (S.D.N.Y. Nov. 9, 2022), ECF No. 80.

53.     On September 18, 2024, the United States District Court for the Southern District of New York entered a judgment against Rogas on the SEC's complaint.

54.     In or about December 2020, demand was made on Dawson for return of the Tender Offer Proceeds.  Dawson refused the demand.

## FIRST CAUSE OF ACTION
### (Avoidance and Recovery of Actual Fraudulent Transfers Pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550)

55.     Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

56.     Within the two years prior to the Petition Date, NS8 transferred to Dawson $1,464,647 of Tender Offer Proceeds in connection with the Tender Offer.

57.     Within the two years prior to the Petition Date, NS8 paid Dawson a total of no less than $573,474.67 in Employment Proceeds on account of his employment at NS8.

58.     All of the above transfers derived from one of NS8's bank accounts and NS8 had an interest in the property transferred.

59.     All of the above transfers were made, and received, with the actual intent to hinder, delay, or defraud NS8 and its creditors/investors.  And because of the pervasive fraud, criminal conduct, and other misconduct detailed in this Complaint, including the inevitability that the fraud would be uncovered and the investors' shares would be worth virtually nothing, such transfers are also presumed to have been made with actual intent to hinder, delay, or defraud creditors.

60.     NS8 did not receive anything of value in exchange for such transfers.

61.     By reason of the foregoing, the above transfers constitute actual fraudulent transfers which should be avoided pursuant to Bankruptcy Code § 548(a)(1)(A).

62.     Dawson was the initial transferee of these transfers or the immediate or mediate transferee of such initial transferee or the person for whose benefit these transfers were made.

63.     Pursuant to § 550(a) of the Bankruptcy Code, Plaintiff is entitled to recover these transfers from Dawson, plus interest thereon to the date of payment and the costs of this action

**SECOND CAUSE OF ACTION**
**(Avoidance and Recovery of Actual Fraudulent Transfers**
**Pursuant to 11 U.S.C. §§ 544 and 550 and 6 Del. Code § 1301, et seq.)**

64.     Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

65.     Within the four years prior to the Petition Date, NS8 transferred to Dawson $1,464,647 of Tender Offer Proceeds in connection with the Tender Offer.

66.     Within the four years prior to the Petition Date, NS8 paid Dawson a substantial salary, bonuses, and benefits as an employee of NS8, including, without limitation, the Employment Proceeds.

67.     All of the above transfers derived from one of NS8's bank accounts and NS8 had an interest in the property transferred.

68.     All of the above transfers were made, and received, with the actual intent to hinder, delay, or defraud NS8 and its creditors/investors.  And because of the pervasive fraud, criminal conduct, and other misconduct detailed in this Complaint, including the inevitability that the fraud would be uncovered and the investors' shares would be worth virtually nothing, such transfers are also presumed to have been made with actual with intent to hinder, delay, or defraud creditors.

69.     NS8 did not receive anything of value in exchange for such transfers, and NS8 did not receive valid consideration in exchange for the funds.

70.     Dawson should have known of the fraud and indirectly participated in the fraud by, among other things, preparing false monthly and annual projections, sharing NS8's fictitious customer numbers with investors, and serving as NS8's head of sales, a team that was essential to Rogas's ability to create and maintain a false image of NS8 as a legitimate business, deceive NS8's investors, and raise additional capital for NS8.

71.     At all relevant times, NS8 had actual creditors holding unsecured claims allowable within the meaning of §§ 502 and 544(b) of the Bankruptcy Code, and § 1301 of Title 6 of the Delaware Code.

72.     Therefore, these transfers are voidable under § 544(b) of the Bankruptcy Code and 6 Delaware Code § 1304(a).

73.     By reason of the foregoing, the above transfers constitute actual fraudulent transfers which should be avoided, unwound and recovered pursuant to Bankruptcy Code §§ 544 and 550(a), and applicable state law.

**THIRD CAUSE OF ACTION**
**(Avoidance and Recovery of Constructive Fraudulent Transfers**
**Pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550)**

74.     Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

75.     During the two-year period immediately preceding the Petition Date, NS8 transferred the Tender Offer Proceeds and Employment Proceeds to Dawson. These transfers constitute transfers of the Debtor's property interests.

76.     Debtor received no consideration or received less than reasonably equivalent value on account of these transfers.

77.     At the time of each of these transfers, Debtor (a) was insolvent, or Debtor became insolvent as a result of the transfers; and/or (b) was engaged, or about to engage, in business or a transaction for which any property remaining with the Debtor or for whose benefit the transfers were made was an unreasonably small capital; and/or (c) intended to incur, or believed it would incur, debts that would be beyond its ability to pay as such debts matured.

78.     Therefore, these transfers are voidable under § 548(a)(1)(B) of the Bankruptcy Code.

79.     Dawson was the initial transferee of these transfers or the immediate or mediate transferee of such initial transferee or the person for whose benefit these transfers were made.

80.     Pursuant to § 550(a) of the Bankruptcy Code, Plaintiff is entitled to recover these transfers from Dawson, plus interest thereon to the date of payment and the costs of this action.

**FOURTH CAUSE OF ACTION**
**(Avoidance and Recovery of Constructive Fraudulent Transfers**
**Pursuant to 11 U.S.C. §§ 544(b) and 550 and 6 Delaware Code §§ 1304(a), 1305, and 1307)**

81.     Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

82.     Pursuant to § 544(b) of the Bankruptcy Code, a trustee or debtor-in-possession may avoid, *inter alia*, any transfer of an interest of the debtor in property that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under § 502 of the Bankruptcy Code.

83.     During the four-year period immediately preceding the Petition Date, NS8 transferred to Dawson the Tender Offer Proceeds and substantial salary, bonuses, and benefits as

an employee of NS8, including, without limitation, the Employment Proceeds. These transfers to Dawson constitute transfers of the Debtor's property interests.

84.     Debtor received no consideration or less than reasonably equivalent value on account of the transfers.

85.     At the time of these transfers, Debtor (a) was insolvent, or Debtor became insolvent as a result of the transfers, (b) was engaged, or about to engage, in a business or a transaction for which the remaining assets of Debtor were unreasonably small in relation to the business or transaction, and/or (c) intended to incur, or believed or reasonably should have believed it would incur, debts beyond its ability to pay as such debts matured.

86.     At all relevant times, Debtor had actual creditors holding unsecured claims allowable within the meaning of §§ 502 and 544(b) of the Bankruptcy Code, and § 1301 of Title 6 of the Delaware Code.

87.     Therefore, these transfers are voidable under § 544(b) of the Bankruptcy Code and 6 Delaware Code §§ 1304(a) and 1305.

88.     Dawson was the initial transferee of these transfers or the immediate or mediate transferee of such initial transferee or the person for whose benefit these transfers were made.

89.     Pursuant to Bankruptcy Code § 550(a) and 6 Delaware Code § 1307, Plaintiff is entitled to recover these transfers from Dawson, plus interest thereon to the date of payment and the costs of this action.

## FIFTH CAUSE OF ACTION
### (Breach of Fiduciary Duty)

90.     Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

91.     At times relevant to the allegations in this Complaint, Dawson was an officer and/or employee of NS8.

92.     As an officer and/or employee of NS8, a Delaware corporation, Dawson owed NS8 fiduciary duties, including but not limited to fiduciary duties of good faith, candor, care, and loyalty.

93.     Dawson repeatedly breached his fiduciary duties to NS8 by, among other things:

- Ignoring numerous red flags indicating that NS8's revenues were fake;

- Ignoring numerous red flags indicating that NS8 was exponentially overreporting its customer numbers;

- Building and running an enterprise sales team that he admitted he knew was a waste;

- Using revenue and customer data that Dawson should have known was false to prepare monthly and annual projections and to advocate for and award commissions and/or bonuses to members of his sales team;

- Failing to inform NS8's board of directors of the facts and circumstances he was aware of relating to the fraud; and

- Causing NS8 to accept investments based on financial statements and customer numbers that Dawson should have known were false.

94.     The numerous breaches of duty by Dawson, as detailed in this Complaint directly caused the value of NS8's business to be destroyed and more than $150,000,000 in damages to NS8, its investors and creditors.

## SIXTH CAUSE OF ACTION
### (Aiding and Abetting Breach of Fiduciary Duty)

95.     Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

96.     At times relevant to the allegations in this Complaint, Rogas was an officer and director of NS8.

97.     As an officer and director of NS8, a Delaware corporation, Rogas owed NS8 fiduciary duties, including but not limited to fiduciary duties of good faith, candor, care, and loyalty.

98.     Rogas repeatedly breached his fiduciary duties to NS8 by perpetrating and covering up his fraud.

99.     Dawson had full knowledge and awareness that Rogas had a fiduciary relationship with NS8 and should have known that Rogas was breaching his fiduciary duties to NS8.

100.    Dawson indirectly, knowingly and actively participated in Rogas's breaches of duty by, among other things, using Rogas's fictitious revenue and customer data to prepare false monthly and annual projections; serving as NS8's head of sales, a team that was essential to Rogas's ability to create and maintain a false image of NS8 as a legitimate business, deceive NS8's investors, and raise additional capital for NS8, all of which allowed the fraud to continue; and failing to inform NS8's board of directors of the facts and circumstances he was aware of relating to the fraud.

101.    The numerous breaches of duty by Rogas in which Dawson indirectly participated, as detailed in this Complaint, directly caused the value of NS8's business to be destroyed and more than $150,000,000 in damages to NS8, its investors and creditors.

## SEVENTH CAUSE OF ACTION
### (Unjust Enrichment)

102.    Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

103.    Dawson was a senior executive of NS8 who turned a blind eye to Rogas's fraud by, among other things, using Rogas's fictitious revenue and customer data to prepare false monthly and annual projections; serving as NS8's head of sales, a team that was essential to Rogas's ability

to create and maintain a false image of NS8 as a legitimate business, deceive NS8's investors, and raise additional capital for NS8, all of which allowed the fraud to continue; and failing to inform NS8's board of directors of the facts and circumstances he was aware of relating to the fraud.

104.     Dawson received $1,464,647 of Tender Offer Proceeds, which were artificially inflated by Rogas's fraud, and substantial salary, bonuses, and benefits as an employee of NS8, including, without limitation, the Employment Proceeds.

105.     Dawson benefited from his employment contract with NS8, and his participation in the Tender Offer, which were products and/or results of Dawson's unjust conduct that both prolonged NS8's existence and allowed Dawson the opportunity to obtain such contract and enter into the Tender Offer as one of Rogas's aides.

106.     Dawson's unjust conduct constitutes grounds to rescind his employment contract and any contract for the sale of his shares to NS8 in connection with the Tender Offer.

107.     Dawson was unjustly enriched by the salary and bonuses he received, including, without limitation, the Employment Proceeds, and the Tender Offer Proceeds.

108.     Dawson received such amounts at the expense, and to the detriment, of the Debtor, its creditors and investors.

109.     It would be unconscionable and against the fundamental principles of justice, equity, and good conscience for Dawson to be permitted to retain such amounts, which he received, and continues to benefit from, without justification.

110.     Plaintiff is entitled to restitution from Dawson and an order disgorging such amounts.

## EIGHTH CAUSE OF ACTION
### (Disallowance of all Claims Pursuant to 11 U.S.C. § 502(d) and (j))

111.    Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

112.    Dawson is a transferee of transfers avoidable (the "Avoidable Transfers") under §§ 544 and/or 548 of the Bankruptcy Code, which property is recoverable under § 550 of the Bankruptcy Code.

113.    Dawson has not paid the amount of the Avoidable Transfers, or turned over such property, for which he is liable under 11 U.S.C. § 550.

114.    Pursuant to 11 U.S.C. § 502(d), any and all claims of Dawson and/or his assignees, against the Debtor's chapter 11 estate or Plaintiff must be disallowed until such time as he pays to Plaintiff the aggregate amount of the Avoidable Transfers, plus interest thereon and costs.

115.    Pursuant to 11 U.S.C. § 502(j), any previously allowed claims of Dawson against Debtor's estate must be reconsidered and disallowed until such time as Dawson pays to Plaintiff the aggregate amount of the Avoidable Transfers.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court grant it the following relief against Dawson:

A.    On Plaintiff's First through Fourth Counts, judgment in favor of Plaintiff and against Dawson, avoiding all of the transfers and directing Dawson to return to Plaintiff the amount of the transfers, pursuant to §§ 544(a), 548, and 550(a) of the Bankruptcy Code, and 6 Delaware Code §§ 1301, 1304(a), 1305, and 1307, plus interest from the date of demand at the maximum legal rate and to the fullest extent allowed by applicable law, together with the costs and expenses of this action including, without limitation, attorneys' fees;

19

B.      On Plaintiff's Fifth and Sixth Counts, judgment in favor of Plaintiff and against Dawson and requiring Dawson to pay compensatory and punitive damages, plus interest from the date of demand at the maximum legal rate and to the fullest extent allowed by applicable law, together with the costs and expenses of this action including, without limitation, attorneys' fees;

C.      On Plaintiff's Seventh Count, judgment in favor of Plaintiff and against Dawson, awarding Plaintiff damages against, and disgorgement and restitution from, Dawson, plus interest from the date of demand at the maximum legal rate and to the fullest extent allowed by applicable law, together with the costs and expenses of this action including, without limitation, attorneys' fees;

D.      On Plaintiff's Eighth Count, judgment in favor of Plaintiff disallowing any claims held or filed by Dawson against Debtor's estate until Dawson returns the avoidable transfers to Plaintiff pursuant to 11 U.S.C. §§ 502(d) and (j); and

E.      Granting Plaintiff such other and further relief as this Court may deem just and proper.

*(Remainder of page intentionally left blank)*

Dated: October 17, 2024
       Wilmington, Delaware

**BLANK ROME LLP**

By: */s/ Jordan L. Williams*
Stanley B. Tarr (No. 5535)
Jordan L. Williams (No. 7128)
1201 N. Market Street, Suite 800
Wilmington, Delaware 19801
Telephone:    (302) 425-6400
Facsimile:    (302) 425-6464
Email: stanley.tarr@blankrome.com
       jordan.williams@blankrome.com

-and-

John E. Lucian (*pro hac vice*)
One Logan Square
130 N. 18th Street
Philadelphia, Pennsylvania 19103
Telephone:    (215) 569-5500
Facsimile:    (215) 569-5555
Email: john.lucian@blankrome.com

*Counsel for Plaintiff*